FAIRMOUNT PARK RACEWAY, INC., et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Melville BITNER, Trustee, et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Ray C. and Veronica BENNIGSEN, Respondents.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Russell R. and Katherine CASTEEL, Respondents.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Edwin C. and Martha H. MOON, Respondents.

John Y. Merrell, Washington, D. C., for Fairmount Park and others.

Louis F. Oberdorfer, Asst. Atty. Gen., William Friedlander, Atty., Tax Division, Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., for Collector of Internal Revenue.

Before SCHNACKENBERG, CASTLE and KILEY, Circuit Judges.

KILEY, Circuit Judge.

This is a consolidation of two petitions for review of Tax Court decisions sustaining the Commissioner's determinations of income tax deficiencies arising from the leasing of the Fairmount Race Track in Collinsville, Illinois. For convenience we shall treat the question in each petition separately.

## No. 14215

The question here is whether the Tax Court erred in sustaining the Commissioner's assessments against the Fairmount Park Raceway, Inc., based on his disallowance of rent deducted by it for the fiscal years 1953, 1954 and 1955. We think not.

In 1947 several individuals leased from R. E. Costello the race track; formed a partnership to which they assigned the lease; and then formed the taxpayer corporation, of which they were the sole stockholders, and to which they, as partners, sublet the track. Under this sublease the original rent, in 1948, was 50 per cent of the corporate net profits. It rose in the calendar years 1949 and 1950 to 75 per cent of the net profits, and in 1951 through 1954 to 100 per cent of the net profits. In its income tax returns for the fiscal years 1953, 1954 and 1955 the corporation claimed deductions of rental paid to the partnership of $656,-618.40, $762,009.28, and $534,108.28 respectively. The Commissioner determined that these rentals were unreasonable and excessive by the amounts of $346,790.08, $412,359.50, and $221,342.12 respectively, and issued appropriate deficiency notices from which this case arises.

The Tax Court was "convinced" that petitioner corporation had not met its burden of overcoming the presumption of validity in favor of the Commissioner's determination. It is conceded

that the corporation [1] had that burden. Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935).

The Commissioner's determination was based on his judgment that a reasonable rental for the track during the taxable years was 2 per cent of the "mutuel handle." [2] The corporation contends this basis has no rational foundation, and is without a substantial basis in the evidence.

In the Tax Court and in this court that contention is mainly against the testimony of Commissioner's witness, Grimes, a "valuation consultant" for the Internal Revenue Service, whose opinion as to the reasonable rental supports the Commissioner's determination. In effect the reliance is upon a "weakness" in the Commissioner's case, i. e., that Grimes' opinion does not support a 2 per cent rental and his opinion was arbitrarily disregarded by the Tax Court.

Grimes testified from a study of other race track leases, and interviews, published reports of racing businesses, and consultation with public and private persons in the racing world. His opinion, based on this study, was that, since the corporation's lessor, before us, bore none of the racing meet expenses, the corporation's rent should not reasonably exceed 40 per cent of the net profit and that a reasonable rental based on "mutuel handle" would be "between one and one-quarter and one and one-half per cent * * * but certainly not more than two per cent." No expert testimony to refute that of Grimes was introduced, no evidentiary estimate made by the corporation of what a fair rental would be. There is a rational foundation for the 2 per cent formula.

■ We think arguments directed at Grimes' qualification, experience, lack of showing that he studied comparable leases, did not see the Fairmount Track, and the like, are unavailing. Those considerations were involved in the weight to be given Grimes' opinion. We can not say that the Tax Court was required to reject the opinion. In 1952 the corporation's lessor, the partnership, paid rent to Costello of $67,500.00, in 1953, $67,-500.00, and in 1954, $49,786.00. Grimes' testimony, the relationship of the corporation's stockholders and the partnership, plus the Tax Court's comparisons of the rentals paid by the corporation and the rents paid by the partners to Costello give substantial support to its decision on this issue in favor of the Commissioner.

■■ The Tax Court could properly reject the notion advanced that the corporation was in reality—considering the investments of the partners in the track and the corporation's use of the partners' borrowing power, and its capital of only $17,500.00—merely an agency of the partners which was entitled not to the earnings the Commissioner determined for it, but really entitled to only a fee. The "business purpose" of the corporation was operation of the track in its own right and not the normal duties of an agent. National Carbide Corp. v. Commissioner, 336 U.S. 422, 437, 69 S.Ct. 726, 93 L.Ed. 779 (1949). Identity of ownership and control does not create an agency for tax purposes. 336 U.S. at 430, 69 S.Ct. at 730. By the lease it appears that the partnership chose to avoid the burdens of principalship. 336 U.S. at 438, 69 S.Ct. at 734.

Nos. 14216–14222.

■ The common issue in these appeals is whether the Tax Court properly decided that transactions in 1954 and 1957 between the partners and the Fairmount Park Jockey Club, Inc., were subleases and not "sales"; and that therefore the Club's payments to the partners constituted ordinary income and not capital gains. We think the decision was right.

---

1. When we say "corporation" we include the other taxpayers on this appeal in No. 14215, whose causes were consolidated with the corporation before the Tax Court, since the issue is common to them all.

2. The amount of money bet at the race track.

In September, 1954, the partnership held the Costello lease for an unexpired term of three years with options to renew for two additional terms of five years each. On September 17, 1954, the sub-lease between the partners and the Fairmount Park Raceway Corporation was cancelled. The same day the partners entered into an "Assignment" with the Club, purporting to assign the partners' "right, title and interest" in their lease with Costello. There was also made that same date an "Agreement" between the partners and the Club designated, respectively, "Sellers" and "Buyer" purporting to "sell" the Costello lease of September 11, 1953,[3] and all other track property. The buyer purported to purchase the partners' leasehold estate under the Costello lease, which expired by its terms November 5, 1957, for a consideration of $1,035,000.00, and of $85,000.00 for "other property."[4]

The "Agreement" expressly excluded from the "sale" the options which the partners had in the Costello lease for the additional five year terms. However, the partners expressly granted to the Buyer the "exclusive right and option to purchase" the options any time prior to 100 days before the termination of the leasehold.

The Buyer covenanted to pay Costello the rent under the original lease of September 11, 1953, "and keep and perform all other covenants * * * to be kept * * * by the lessees therein during the remainder of the original term * * * and of any extension thereof if either of the options * * * be exercised * *." Should the Buyer fail to pay said rental or to keep said covenants, or default in payments either in respect of the "sale" of the leasehold or in the purchase of the option, Sellers "may, after giving buyer at least thirty (30) days written notice * * * cancel this agreement and retake all of the properties and rights and interests covered by this agreement."

In 1957 the Club exercised the option to purchase, for $700,000.00, the partners' options under the Costello lease for the two additional five year terms, and the partners executed an "Assignment", with respect thereto, dated September 19, 1957.

The Tax Court decided the parties intended the 1954 "Assignment", which was subject to the "Agreement" of the same date, to be a sublease because, among other things, the partnership reserved the options and a right to re-enter in case of default in the Club's performance of its obligations under the "Agreement." The Tax Court also decided that the 1957 "Assignment" was nothing more than an anticipated ten year extension of the 1954 "sublease" of the Costello lease. It concluded that the Commissioner's determination, that the income from these transactions to the partners was rental and therefore ordinary income, was correct.

It is agreed that the test is not the words used in the agreement, but the intention of the parties to be gleaned by the court from its terms and the circumstances. Orr v. Neilly, 67 F.2d 423, 424 (5th Cir. 1933); Voloudakis v. Commissioner, 274 F.2d 209 (9th Cir. 1960); Stewart v. Long Island R. Co., 102 N.Y. 601, 8 N.E. 200, 201–202 (1886).

Though we are of the opinion that the Tax Court did not err in finding that the parties intended subleases in both the 1954 and 1957 "Assignments", we disagree with the Tax Court that a reason for finding the 1954 "Assignment" to be a sublease was because the reservation of the options was a reservation of part of the leasehold. The options were separate rights from the leaseholds. Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824 (1936); Goldstein v. Allen, 306 F.2d 711, 713 (10th Cir. 1962); Mack v. Commissioner, 148 F.2d 62 (3d Cir. 1945), cert. denied, 326 U.S. 719, 66 S.

---

3. The original lease of 1947, first renewed in 1950, was renewed September 11, 1953, for a term to November 5, 1957.

4. This is concededly a "sale" of "other property."

Ct. 23, 90 L.Ed. 425. This, however, does not detract from the Tax Court's opinion construing the "Assignment".

The legal distinction between an assignment or sale of a lease and a sublease is whether the entire leasehold passes from the lessee to his transferee so as to put the latter and the original lessor in a landlord-tenant relationship; or whether less than the leasehold interest passes so as to leave the transferee in the landlord-tenant relationship with the transferor. Sexton v. Chicago Storage Co., 129 Ill. 318, 21 N.E. 920 (1899). There in the suit between the basic lessor and his lessee's transferee the court held the latter was liable to the basic lessor despite the facts that the transferor reserved the right to re-enter, there was a covenant to surrender, and there was additional rent to that reserved in the basic lease.

The Illinois court in Sexton followed the rule in Stewart v. Long Island R. Co., 102 N.Y. 601, 8 N.E. 200 (1886), *as to an original lessor and his lessee's transferee*, where the lessee transfers his entire leasehold interest even though the right of re-entry is reserved. However, the rule *as to the original lessee and his transferee* is that even if the transaction purports to transfer the entire leasehold, if a lease is intended, as shown by the retention of the right of re-entry, the relationship of landlord and tenant is created between them. Stewart v. Long Island R. Co., 102 N.Y. 601, 8 N.E. 200, 201–202 (1886).

In Voloudakis v. Commissioner, 274 F. 2d 209, 212 (9th Cir. 1960), the court, in a tax case, found the reservation of a right of re-entry a reason for attributing the landlord-tenant relationship to the transaction. The court's reasoning applied to the case before us is: If the transaction was a sale the only means of enforcing collection would be an action; and the Club, if it was a sale, could at any time by agreement with Costello "modify, alter, or even surrender" the lease. But the partners "did not want it that way." Since they "deliberately chose to retain

continuing interest * * * for their own protection," they must "deal with the consequences" and have the payments partake of the nature of rent. 274 F.2d at 213. Also in Orr v. Neilly, 67 F.2d 423 (5th Cir. 1933), the re-entry right was a "strong indication" of intention. See also Waller v. Commissioner, 40 F.2d 892, 893 (5th Cir. 1930).

Since in both the 1954 and 1957 "Assignments" the partners retained the right of re-entry by the "Agreement" of 1954, the Tax Court could reasonably have found the partners and the Club intended "subleases" by these transactions.

In view of these conclusions we do not reach any other point in these appeals.

Judgments in Nos. 14215–22 are affirmed.